ST. PAUL, J.
 

 Plaintiffs are retail merchants, conducting the Imperial Shoe Store, at Canal and Bourbon streets, in the city of New Orleans. In 1912 they purchased a secondhand iron safe. Some time thereafter the safe was broken into, and was thereafter repaired. In January, 1918, the safe was insured against burglary by defendant company for one year; and in January, 1919, the insurance was renewed for another year.
 

 The policy was to cover any loss of property—
 

 “feloniously taken by any person or persons, at any time during the day or night while the premises are not actually open for the transaction of business, from any safe, chest or vault to which insurance hereunder specially attaches, after entry into the safe or chest or vault by such person or persons in the manner hereinafter set forth.”
 

 The term “entry,” within the meaning of the policy, was declared to be limited to—
 

 “the felonious and forcible opening of a safe or vault or chest by the use of tools or electricity or chemical or explosives directly upon the exterior walls thereof or upon the outer or principal door thereto.”
 

 The defendant was not to be liable—
 

 “if the assured or any associate in interest, or any officer or clerical employee of the assured, or any other employee of the assured directly in charge of property insured, is criminally implicated as principal or accessory in effecting or attempting to effect loss covered under this policy.”
 

 Nor was defendant to be liable for property taken from any safe or chest or vault—
 

 “unless at the time of the occurrence of the loss all doors to the safe or chest or vault from which the loss occurs are properly closed and locked by all combination and (or) time locks with which such doors are respectively provided; * * * nor if the entry thereinto is effected by unlocking the door thereto by a key, or by the manipulation of the combination lock; nor if the entry is effected in any manner otherwise than as specified in General Provision No. 1 (defining ‘entry,’ as above).”
 

 I.
 

 From the foregoing it will be seen that the cause- last quoted above is simply an amplification, or (in effect) reiteration, of what is meant by an “entry” into the. safe or chest or vault; and therefore needs no further attention here.
 

 On the other hand, it is clear that the clause immediately preceding the clause last mentioned provides for a limitation of the general liability of the defendant for an “entry” effected in the manner defined by the policy.
 

 II.
 

 Some time between the closing of plaintiffs’ store on the evening of Saturday, November 15, 1919, and the reopening thereof on the following Monday morning, plaintiffs’ store was entered and the contents of the safe stolen ; being the cash receipts of the Saturday, and exceeding the amount of the policy herein ($2,500).
 

 Plaintiffs sue upon the policy, alleging that the safe was
 
 entered
 
 in the manner defined therein. Defendant tendered (in effect) the general issue. It did not set up
 
 *241
 
 the limitation above mentioned; and hence that defense is not available.
 

 “Where a policy insures generally against a particular peril, and contains a further clause exempting the company from liability for loss caused in a certain manner, which would otherwise have fallen within the general terms of -the policy, the burden is upon the insurer to allege and prove that the loss fell within the exemption. Such a clause is considered as an exemption from liability, and a defense rather than as an exception proper, limiting and defining the risk covered.” Fidelity & Casualty Co. of N. Y. v. First National Bank of Fallis, 42 Okl. 662, 142 P. 312; Cooley’s Briefs on Insurance, vol. 4, p. 3035.
 

 It is therefore largely immaterial to the issue herein involved
 
 who
 
 might have been the thief, or- when and by what means he entered plaintiffs’ store; the sole question being whether the safe was closed and locked, and the thief “entered” the same in the manner defined in the policy, and not by manipulating the combination lock thereof.
 

 The case was tried by a jury, who returned a unanimous verdict for plaintiff; and defendant appeals.
 

 III.
 

 Mr. Eckert, who opened the store on Monday morning and admitted the porter, testified (in part):
 

 “ * * * The porter went up to the fourth floor and discovered the ladder at this hatch hole, and came down immediately, and said to me: ‘There is something wrong.’ * * * I went upstairs right away and we saw them, and
 
 then came down to the
 
 third floor; and I saw all my papers on the third floor right by the safe. The papers were lying around the safe on the floor, * * * and I examined the safe, and found that the safe had been opened. * * * The combination was lying on the floor —the knob. * * * The second piece, called the dial, was on the safe. * * * The doors of the safe were closed, but unlocked.
 

 It was shown that the safe had been locked before the store was closed on Saturday evening. It was shown that the knob and dial had been knocked off by a blow or blows, given with a hammer or other heavy instrument.
 

 This was the prima facie case made out by plaintiffs, which they supplemented by showing that all their employees had been with them from 10 to 15 years, and were still with them; that after the theft a private detective had been put on their trail, without result; that, of their employees, only two had the combination to the safe, and these two had no key to the store; that only one employee had a key to the store, but had not the combination to the safe; that .the two partners alone had both the key to the store and the combination to the safe; that the junior partner was in New York at the time.
 

 IV.
 

 To rebut the prima facie case thus set up, the defendant relied principally on the testimony of the chief of police, and of two safe makers.
 

 The chief of police testified (in part):
 

 “After examining the front door, I found that the place [store?] had been entered by a key, or that the front door [to the store?] had been left open. I found a ladder leading to the hatch. No one had entered the hatch, as the dust on the inside of the attic was
 
 not
 
 disturbed. Further investigation developed that the hatch from the attic to the roof was locked -from the inside. There was no way for any one to have gotten from the roof of the building to adjoining buildings, or to the street.”
 

 More testimony was taken, both pro and con, as to the possibility of entering or leaving the store otherwise than by the front door. The senior partner testified that the front door could not have been left open, because there was a watchman whose business it was to try the door after the closing of the store, who would have given notice, had he found it open or unlocked; that the lock was not a spring lock, and could not be opened or closed from the inside without a key.
 

 
 *243
 
 But all this testimony leads nowhere. There was, as aforesaid, a' fourth floor to the building, above that on which the office was, and the chief of police speaks of that fourth floor as an “attic.” Eckert testifies that on that fourth floor there was “a
 
 little room,
 
 about six feet away from the opening,” in which the aforesaid ladder was usually kept. This
 
 might
 
 have afforded a convenient hiding place for one entering the building, say, in the last busy hour, from 5 to 6, during which the store sold $636 of shoes for cash, at retail; and there were windows on the second floor through which an active man
 
 might,
 
 doubtless, find a way out of the store in the darkness and quiet of early Sunday morning; nor are skeleton keys and their use unknown to burglars — all of which are no more fanciful surmises than that either the one young lady who had the combination to the safe, or the one young man who also had it, carried false keys to the store, or conspired, for the purpose of robbing the safe, with the one employee who had a key; or, finally, that the senior partner himself, who alone had both key and combination, was the one who emptied the safe.
 

 There was therefore a possibility that the thief might be some one other than a person connected with the store. And, since any such surmise was within the range of
 
 possibility,
 
 and nothing in the evidence tended to show which was the more probable the jury evidently rejected such as were not in accord with the pleadings; and concluded that, since the defendant
 
 did not even charge,
 
 much less prove, that the theft had been committed by some one connected with the store, they (the jury) would not
 
 assume
 
 that such was the case. And in this the jury did not err.
 

 Y.
 

 The theory of the defense is that the safe was opened by some one who knew the combination; that he thereafter knocked off the knob and dial, 'and placed the ladder under the hatch, in order to give the impression that the safe had been entered by force, and thus cover up'the fact that the safe had been opened by means of the combination.
 

 To support this defense it is shown that it would have taken at least two blows, perhaps three, to knock off the knob ; that when these blows were struck the combination stood at or about the opening number (i. e., last number before opening); that when the lock was removed it was found that all the tumblers were “lined up”; that with the dial knocked off, the tumblers could not be lined up. And from this it is contended that the safe was first opened by means of the combination, and the combination afterwards knocked off to hide the fact.
 

 But, none the less, the experts were not so sure of this. Mr. Hagstette testified (in part):
 

 “Question: Did you make any experiment on this door to see if it was (opened) by the application of force or otherwise? Answer: Well, I will tell you. Mr. Cahn followed me úp, and said: ‘Do you know that they could open the safe?’ And I said: ‘Not without dynamite.’ And he said: ‘Do you know that an expert has been here and examined the safe, and could open it?’ And I said I would like to see that.' * * * I went to the safe and examined it, and by straining — you have to give a heavy strain on it to do it. Erom that make of safe there might be 1 out of 10 or 15; but I noticed, when I was repairing it, it would have been possible to have done it; you shove that shaft and drive the dial in position in there, or it could not be done.
 

 “Question: Now that impression on the handle — did not that indicate to you that force had been used to open that safe? Answer: Well, now, I tell you, that is a very fine point; the door, which I put it on the trestle, I found the tumblers in line. Whoever did the work, he may have been a good one, and he may have tried to force on the handle, but he did not come to any result at all by that; and then again it might have been a party who was -very familiar with that make of safe; I cannot solve that. * * *
 

 
 *245
 
 “Question: And you found that you could open it by bringing force on the outer door. Answer: Yes, sir; this competitor of mine, supposed to be an expert of Dameron & Pier-son, said so; and I tested it and spoke to Mr. Coats, and he said that he did not know that, and that it could be done only on a few of them. * * »
 

 “Question: How many people in this town close their safes securely as they should be? Answer: You take half the people — they do not close them right; they turn the knob a couple of times, and to close it right it should be turned five or six times.
 

 “(Note. — Miss Mullen had previously testified before the two experts [in part] as follows: I am the one that closes the safe. * * * I close the inside doors, * * * and then the last doors, and turned the combination — turned it one way and then another. * * ■ * I take and turn it like this, and then the other way [indicating] two or three times.)”
 

 Mr. Coats, another safe manufacturer, then testified (in part) as follows:
 

 “Question: Supposing that it was proven, as it has been, that after this robbery the tumblers of the lock were lined up and the lever was up (and bolts drawn), * * * would you say that the knocking off of the dial would have facilitated in any way the opening of the safe? Answer: Except that it would eliminate that last number. This spindle is rigid and is pinned to the driving wheel, and the moment the dial is broken from the spindle the driving wheel may be pushed out of position or fall out at the slightest touch; that would eliminate the locking by one wheel. * * *
 

 “Question: How do you turn these discs (tumblers)? Answer: 'With the dial outside.
 

 “Question: After that the safe can be opened? Answer: That would eliminate one of the numbers. Suppose that the safe was not properly locked or twisted around; you only revolve one wheel, and that one wheel would fall over, if that spindle was open.
 

 “Question: If the safe had been improperly locked (meaning in an inefficient'manner, such as you have described), not revolving the dials or discs sufficiently to get complete dislodgement of the tumblers — in a situation such as that, and the safe opened such as in this case, would not the fact the tumblers were set be perfectly consistent with the theory that the safe was opened by force? Answer: Yes, sir; it would, if it was not properly locked-
 

 “Question: Assuming that the safe in this case had been locked in the manner described by the young lady who was on the stand Monday, would the fact that the tumblers were found set after the robbery indicate in itself that force was not used to open that safe? Answer: No, sir. * * *
 

 “Question: Did you make any experiment on this safe to find out if it could be opened by physical force? Answer: I did, certainly.
 

 “Question: Did you find out that you-could do. so? Answer: Yes, sir.
 

 “Question: Without knowledge of, or manipulation of, the combination? Answer: Yes, sir. I would like to explain why it could be done. When the safe was new, that could not happen;- but it has been in service quité a while, and the dial has been changed and replaced with parts not belonging to the safe. I speak of it as I saw it after the robbery and a few days ago.
 

 “Question: This experiment was made a few days ago? Answer: Yes, sir; it is in such shape that it can be opened without the use of anything, and there may be some parts missing.
 

 “(Note: This was objected to, and the witness directed to confine himself to the condition of the safe at the time of the robbery; but the evidence shows that the safe had been
 
 repaired
 
 immediately after a former robbery, and the dial changed
 
 at that time.) *
 
 * *
 

 “Question: Could it be opened by force applied to the handle and dial? Answer: Do you want me to theorize ? * * * I would say that a burglar attempting to open this safe— his first impulse would be to knock off the dial. If those three discs were set in their unlocking condition, and if this dial was knocked off, the other wheel would be the only wheel turned out, and it would fall out of position, ands in falling he could open the safe. I can theorize on the other side of the proposition, if you care to propound the question.
 

 “Question: Then, in the condition described, the safe could be opened by a burglar, after the experiment you made, by force? Answer: .It could.
 

 “Question: Let’s assume that the safe was locked in the manner indicated by the lady; would- that dislodge the three other tumblers ? Answer: It would not.
 

 “Question: That would dislodge only the last tumbler or disc? Answer: Maybe the last one; not the three.
 

 “Question: Would the effect of knocking off this dial leave it appear as if all the discs were'in line? Answer: It would. * * *
 

 “Question: The knocking off of the dial would eliminate the raising of the (last) disc altogeth- . er? Answer: Not necessarily, but the chances
 
 *247
 
 are 95 out of 100 that it would. I made an examination of that lock, and there is enough play in this lock; and I wondered why the back part of this lock was not opened-
 

 “Question: And, if he drove that back a little, it would eliminate the raising of the disc? Answer: Tes. sir.
 

 “Question: How far would you have to drive that pin back to eliminate the raising of the disc? Answer: About an eighth of an inch.
 

 “Question: That shows that it has been driven back? Answer: Tes, sir; it looks like it.
 

 “Question: It would take a blow to drive that back? Answéí: Quite a blow; and the'burglar knows that, if he can get this spindle back, he has a hole in that door through which he can get into that lock; and my theory is that when he jumped this back he found that the safe would open.”
 

 Mr. Hagstette, being recalled, testified further:
 

 “Question: Mr. Coats said that the blow on the dial and the blow which he thinks fell on the handle and the spindle might have dislodged it or some of the tumblers. Did you examine that lock, and are you able to say if any of the tumblers were dislodged? Answer: When this door was taken to the shop the tumblers were all in line.
 

 “Question: Were any of the tumblers dislodged? Answer: No, sir.
 

 “Question: Tou say the whole box was in line? Answer: They were all in line, as I told you before.
 

 “Question: If in a locked condition, could they be driven back? Answer: Tesi sir; if they -knocked the cover off.
 

 “Question: Was the cover knocked off? Answer: No, sir. * * *
 

 “Question: Tou examined that to ascertain if the spindle had been struck, and how far it was knocked back? Answer: As Í told you, it was a hurry job, and I took the door to the shop and got a new dial and rim, and had to finish the job for that evening.”
 

 On looking over the above, we find that we failed to mention that Hagstette had previously also testified as follows:
 

 “Question: Did you see any marks on the handle of that safe, as if it were struck? Answer: There was a mark on the handle, on the right — the left-hand side.
 

 “Question: Is that near the end? Answer: It is what they call the ‘T;’ the pin runs through the handle like a T, and it is marked there. That is áll I saw on that; it looked like it was bent here.
 

 “Question: A little dent, you say? Answer:Tes, sir. * * *
 

 “Question: Did you find any other mark about this safe than the mark on this dial and the breaking of the spindle? Answer: The only marks I saw was on the handle; and when I go on a job of that kind I believe in rushing it and getting done with it.”
 

 VI.
 

 From the foregoing it is clear that, in addition to the manipulation of combination, there were two other methods by which this safe could be opened: The one by using force .upon the handle (called also the T); and the other by knocking off the dial and driving back the pin, if the safe had not been carefully locked. Mr. Coats says the safe had not been properly locked, and it looked as if an attempt had been made to drive back the pin; that the pin needed to be driven back only an eighth of an inch; that he made an examination of the lock and found that there was enough play for that in the lock. Hagstette says that he did a hurry-up job of it; that the handle showed signs of having had force applied to it, so that it is clear that the one who entered the safe attempted, or pretended to attempt, the use of both these outlaw methods. Therefore it is certain that force
 
 was
 
 used upon the safe; and it was peculiarly within the province of the jury, who saw and heard all the witnesses, to determine as a question of fact whether the force so applied was the actual means of entering the safe or only a sham to cover up the fact that the safe was entered by using the combination.
 

 And the transcript shows that 'the jury took such interest in the case as to join in the examination of the witnesses; some of the points most favorable to the defense being brought out by their very questioning. After which they returned a unanimous verdict for plaintiffs, which was in full accord with their rejection of the theory that the
 
 *249
 
 safe was entered by some one connected with the store.
 

 On the whole, we think the jury reached the proper conclusion.
 

 Decree.
 

 The judgment appealed from is therefore affirmed.
 

 OVERTON and ROGERS, JJ., dissent.