OLD COLONY INSURANCE COMPANY *v.* MOSKIOS
ET AL., TRADING AS PHIL MAR RESTAURANT

[No. 95, October Term, 1955.]

*Decided February 17, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Wilbur D. Preston, Jr.,* with whom were *Due, Nickerson, Whiteford & Taylor* on the brief, for appellant.

*Joseph W. Spector,* with whom was *Robert G. Lembach* on the brief, for appellees.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Old Colony Insurance Company, a body corporate, defendant, appellant, from a judgment in the amount of $2,000.00 against it and in favor of Jerry Moskios and Joseph Moskios, trading as Phil Mar Restaurant, plaintiffs, appellees, in a suit on a policy of burglary insurance.

The appellees, being brothers, operated a combination restaurant and tavern on Pulaski Highway. They purchased a policy of insurance known as a Mercantile Robbery and Safe Burglary Policy from the appellant insur-

ance company. The limit of liability in this policy was $2,000.00. The policy contained the following clause: "III. To Indemnify the Insured * * * For all loss by Burglary which shall mean the felonious abstraction of any such insured property from within the insured part, * * * of the safe or vault, by any person or persons making felonious entry into such safe and such insured part thereof, and also into the vault, if any, containing such safe, when all doors of such safe and vault are duly closed and locked by all combination and time locks thereon; provided *that such entry shall be made by actual force and violence of which there shall be visible marks made by tools,* explosives, electricity, gas or other chemicals, upon the exterior of (1) all of said doors of such safe and of the insured part thereof and of the vault, if any, containing such safe, if entry is made through such doors, * * *." (Italics supplied.)

It appears that about 7:30 or 8:00 o'clock on the morning of January 8, 1954, Jerry Moskios, one of the appellees, arrived at his place of business. The building showed marks of forcible entry. The safe was half open and $2,800.00 in cash and $560.00 in checks were missing. Two watches were left. As a result of a suit on the aforesaid policy the aforesaid judgment was entered in favor of the appellees. From that judgment the appellant appeals claiming there was no legally sufficient evidence that the appellees had sustained a loss under the terms of the insurance policy justifying submission of the case to the jury, and that its demurrer prayer should have been granted.

Of course, a demurrer prayer should not be granted and the case taken from the jury if there is any testimony of sufficient probative force, and any inferences of fact fairly deducible therefrom, to enable an ordinary intelligent mind to draw a rational conclusion therefrom in support of plaintiff's right to recover. If there is any evidence competent, pertinent, and coming from a legal source, however slight, legally sufficient to prove the plaintiffs' case, that case should not be withdrawn from

the jury. *Roycroft v. Nellis*, 171 Md. 136, 141, 188 A. 20; *Miller, etc. v. Moose, Lodge No. 358*, 179 Md. 530, 534-535, 20 A. 2d 156.

In the charge to the jury the trial judge stated among other things that in determining whether entry was made by force and violence of which there were visible marks made by tools, they must find that some mark of violence was "left on the outside door of the safe not the inside door, but the outside door on which the combination operated." No objection was made to this part of the charge nor was it contended here that the force used on the inside door alone was sufficient for recovery.

The question here is whether there is any evidence competent, pertinent, and coming from a legal source, however slight, or any inferences of fact fairly deducible therefrom to enable an ordinary intelligent mind to draw a rational conclusion therefrom that the entry of the outside door of the safe in question was made by actual force and violence, of which there were visible marks made by tools. We will therefore recite the evidence most favorable to the appellees.

Jerry Moskios, one of the plaintiffs, appellees, testified that he was a partner in the restaurant business. They had a new Mosler fireproof safe behind the bar which was insured by the aforesaid policy. He and his brother Joseph were the only persons who knew the combination. He came into the restaurant between 7:30 and 8:00 A. M. on January 8, 1954. He found a panel knocked out of the back door of the building and the hinges knocked off. He went to the safe. "I opened the safe—the safe was half way open—everything was out of the safe. The only thing was two watches left." He said $2,800.00 in cash and $560.00 in checks were taken. At first he did not look at the outside door of the safe. He pushed it open and it appeared that a screw driver and chisel had been used on the inside door which had been sprung and was partly open. It is admitted here that there were sufficient marks on the inside door of the safe to justify a finding that the door was broken open with actual force

and violence with tools. He then looked at the outside door of the safe. The combination had a dent in it and there were dents on the upper corner and on another corner of the outside door which looked like chisel marks. There were "bangs" and marks on the combination dial which turned, and which appeared to have been made by a hammer. There were marks on the dial "like a ball-peen, or whatever they used." The mark on the upper left hand side of the outside door looked like a cut mark made by a chisel or screw driver, the same thing that was used inside the safe. This mark did not go through the door. It made a dent "almost an inch or quarter of an inch." He said: "I looked at it and on the left hand corner you could see a dent there where some sort of metal or chisel they had, where they tried to bust it, or whatever they had to do." The combination had a plate on it with numbers. This was "on a tilt." The dent was still in the door at the time of the trial. There were no marks on the safe before the burglary. He called the police and Lieutenant Walter Smith, of the Baltimore County Police Force, arrived. The inner door was just a fraction of an inch thick and was locked with an ordinary key. During part of the day he kept the inside door closed and the outside door open. This outside door was locked by a combination lock. Immediately prior to this occurrence the combination lock worked properly. The night of the burglary his brother locked the safe. He stated that the nature of locking the safe was as follows: "The first thing you do, you put the key in and lock the inside door; after you lock that, you slam the door shut; after you slam the door shut, there is a handle which sticks up, and when you go to lock it, you pull it down, you spin the dial and spin it around back to zero; and if it don't click, the door is locked." In order to open the outside door it was necessary to work the combination. The only people who knew the combination were he and his brother. After the burglary the handle could still be turned on the outside door, the combination would still spin and it could be locked.

They did not use the safe until Mr. Moller, who was in the safe and lock business, came to their place of business about a week after the occurrence, when he changed the combination numbers. This was the only repair made to the outside door.

Christ Moskios, the father of the plaintiffs, appellees, testified that after he received a report that his sons' restaurant had been broken into, he went to the premises. The inside door of the safe was bent and broken. There was a mark on the outside door as if made with a hammer or bar, just like it was on the inside, "just scratched, not deep marks." They put a bar on it and it was locked. There were more than two marks around the combination as if made with a chisel.

Lieutenant Walter Smith, produced as a witness by the plaintiffs, appellees, testified that he was called to the premises between 7:45 and 8:00 A.M. on January 8, 1954. The panel had been broken out of the rear door of the restaurant and the lock snapped on the inside. The cash register had been "tampered with". The inside door of the safe had been broken open. The small knob on the combination had marks like a Stillson wrench. Also they noticed a hole in the center of the knob with which the combination was worked. The combination was marked with a small "ball-peen" hammer. The marks were not deep. He and the other officers came to the conclusion after seeing the safe that the outside door worked properly. There was no question but that the inside door had been broken open. "* * * I did notice a couple of the marks of the Stillson wrench was torn * * *." "The small knob that you operated the dial with is made as a Stillson wrench, it has these grooves all around. It is true that was to keep your fingers from slipping, *but a couple indentations were like pulled,* like something would slip over on the door, the edge of it, you know, they were ragged." As to the marks on the dial, he stated: "It was the same as if you took the inside of a Stillson wrench, like the teeth on the inside of a Stillson wrench would be torn from using it a lot.

That is the way this knob had marks on it." When asked the question: "These marks that you have testified to as being marks of a ball-peen hammer on the dial, *the marks of the wrench,* and the plate missing, you physically saw all of this on January 8, 1954, at the time of the investigation?" he answered: "Yes, sir." The appellant places great stress on the following question and answer of Lieutenant Smith on cross-examination when he was asked whether he thought the marks which he saw on the outside door had anything to do with opening the safe, "That is proper, yes, sir. Because, if the door would have been damaged to the extent that these marks or the combination, due to these marks, would have been broken, that all of that, after locking the door, could have opened it without the combination, definitely, as investigating officers, we would have assumed that that damage did open the safe. If, due to closing the safe, that did not open it, naturally we had no reason to believe that those damages did open the door. Therefore it was not damaged to that extent."

Joseph Moskios, the other plaintiff, appellee, testified that on Thursdays he usually cashed checks for the employees of industrial concerns in the neighborhood. He did not cash as many checks on that day as usual and had more cash on hand than usual. He was afraid to take it home so about 1:55 A. M. on January 8, 1954, he put the money in the safe, locked the inside door, closed the outer door, put the handle down, spun the combination around and back, and tried the handle and it seemed to be secure at that time. When he heard of the robbery the next morning he went to the premises, found the center panel had been burst out of the back door with a crow bar. The inside door of the safe and lock was burst open. The name plate "Mosler Safe" on the center of the outside door was off. "There was a screw off one of the hinges on the right side of the safe, and there were teeth marks on the dial, and like a ball-peen hammer marks around the dial." The screw was missing from the lower hinge on the right side of the outside door. This screw was not

missing before that time. "I said there were teeth marks around the dial and there was like somebody took a ball-peen hammer and hammered around the dial." The chisel mark on the door was about three-quarters of an inch wide and not deep. In reference to the mark on the upper left hand corner of the outside door about two inches from the end of the safe, he said: "It wasn't deep, it was wide. It wasn't into the metal, I wouldn't say. It was three-quarters of an inch into the metal, I mean not in the metal, but three-quarters of an inch wide where they were hammering." When he closed the safe that night the dial was in good shape and the sign was on the dial. There were no chisel or wrench marks or roughness on the dial and the combination worked properly at that time. It also worked properly after the alleged burglary.

Mr. Moller, called by the defendant, appellant, the proprietor and owner of a safe and lock company, testified that he changed the combination on the safe on January 20, 1954. The outside door was three or four inches thick. No repairs were necessary to the working mechanism on the outside door. He saw no evidence of the outside door being broken open. The inside door had been pried open. He saw no marks on the dial. The name plate on the safe had nothing to do with the combination on the outside door. When asked whether an expert would use a hammer or wrench in opening a safe, he replied: "The only way I would use a hammer if the lock wasn't in good working order." He admitted on cross-examination that there are people who open safes legally. He admitted that when he went to a place to open a locked safe, he was able by certain manipulations to open that safe. He did not think that persons who engaged in illegal enterprises could accomplish the same thing. When asked whether he was one of the few people who could open a safe, he replied: "I don't say I can open every one because some are burglar proof." When asked whether the safe in question here was a

burglar proof safe, he replied: "I am not positive of that, I am most sure it was, but I am not positive."

Mr. Edwin M. Kabernagle, the manager of the Baltimore branch of the Mosler Safe Company, called as a witness by the defendant, appellant, testified in part as follows: "There are two classifications of safes and I think the jury and the Court should understand the difference between these fire resistant safes and burglary resistant safes. This safe in particular happens to be a fire resistant safe, bearing the Underwriters' Laboratory labels for legal combination locks. This safe is what the trade terms a C label or fire resistant safe. That is a fire resistant safe. The Underwriters' Laboratory is an organization set up by the various insurance companies to assure purchasers of safes that any safe bearing the Underwriters' label is guaranteed to work and to withstand certain attempts at burglary. That is what this fire resistant safe is supposed to do. If I remember correctly, I think I made this sale to these gentlemen. When they come into the store, the first question I usually ask is, what do you want this safe for, as a matter of protecting your records or protecting your money."

In the policy under the question "The safe is burglar-proof; or fireproof only; or fireproof with burglar-proof chest (state which)", the answer was "Fireproof."

The appellant relies strongly on the case of *Newark Dance Palace, Inc. v. Md. Casualty Co.*, 212 N. Y. Supp. 286, 125 Misc. Rep. 869. There, the only question was whether there were "conclusive visible marks of forcible and violent entry into the said safe." Photographs were introduced in evidence which showed one or two small indentations upon the face of the combination dial of the safe. There was testimony that the combination was in good order after the burglary and the lock responded to the manipulations of the tumblers in proper manner. The Court there held that no mechanical principle was proven which would enable a finding that these marks were caused by a forcible and violent entry into the safe. *Cyclopedia of Insurance Law*, Couch, Vol. 5, page 4237. That case is

not in point here because the policy there provided that "the company shall not be liable for loss affected by opening the safe by the manipulation of the lock." Such a restriction is not in the policy here. In *Brill v. Metropolitan Surety Co.*, (1908), 113 N. Y. Supp. 476, relied on by the appellant, the clause that entry must have been made by force and violence by the use of tools was substantially the same as in the policy here. The only visible marks were scratches on the outside of the safe. There was no evidence that these scratches were traceable to the use of tools. The Court found that a motion for a directed verdict should have been granted because it seemed reasonable to infer from the evidence that a memorandum of the combination lock which had been pasted on the front of Brill's desk had been found by the burglar. Here, there is substantial evidence that the marks on the outside of the safe were made by tools and no evidence that a memorandum of the combination was available to the burglars. In *Fidelity & Deposit Co. of Md. v. Spokane Interstate Fair Asso.*, 8 F. 2d 224, the policy specifically excepted liability where the safe was opened by the manipulation of any lock. Also the marks on the safe were placed there before the insurance policy was issued.

However, in *Goldman v. New Jersey Fidelity & Plate Glass Insurance Co.*, (Missouri), 183 S. W. 709, the insurance policy provided that in order to recover entry must have been gained by the use of tools or explosives directly upon the burglar proof part of the safe. The safe was standing open and the lock was thrown. There were three or four marks on the safe which looked as if it had been hit or cut with a chisel. The handle or knob of the safe turned. The combination had marks on it as if it had been hammered. The combination turned but the lock could not be opened. The knob of the handle was slightly bent. There were four or five indentations on the handle as if it had been struck with a hammer or some blunt instrument. A witness for the defendant stated that there were no marks on the handle or combination. A representative of the manufacturer of the safe testified as an

expert that in his opinion the safe could not be opened by beating on the handle although he admitted that he had never tried to see whether this could be done. Another safe expert testified that by turning this safe on its side or bottom and striking blows upon the front part of the handle the bolts would fall back and leave the safe unlocked. The Court held that the case was properly submitted to the jury.

In *Palace Laundry Co. v. Royal Indemnity Co.*, 63 Utah 201, 224 Pac. 657, the policy provided that entry into the safe must be by the use of tools directly upon the outer doors, of which there shall be visible marks upon the safe. The knob with which the combination was worked was "battered up a great deal, very badly scarred up." It was covered with small tool marks as if it had been caught with a Stillson wrench. The combination worked with great difficulty after the incident. A knob had been taken off of one of the hinges. Old soldering on the dial had been "recracked". Witnesses for the defendant testified that they did not notice the marks testified to by the plaintiff. The Court there held that while the evidence was meager and inconclusive there was some substantial evidence from which the jury could infer that the safe had been broken open by the use of tools.

In *Cahn & Wachenheim v. Fidelity & Casualty Co.*, 157 La. 238, 102 So. 320, it was necessary to show that entry was made by the felonious and forcible opening of the safe by the use of tools. The safe had been opened, "The combination was lying on the floor—the knob. * * * The second piece, called the dial, was on the safe. * * * The doors of the safe were closed, but unlocked." The defendant contended that the safe was opened by someone who knew the combination and that he thereafter knocked off the knob and dial in order to give the impression that the safe had been entered via force. There was testimony that the knocking off of the dial would not have facilitated the opening of the safe except to eliminate "the last number". The Louisiana Supreme Court held that it was certain that force was used upon the safe and it was peculiarly

within the province of the jury, who saw and heard all the witnesses, to determine as a question of fact whether the force as applied was the actual means of entering the safe or only a sham to cover up the fact that the safe was entered by using the combination.

In the case of *Prothro v. Commercial Cas. Ins. Co.,* (1941), 200 S. C. 432, 21 S. E. 2d 1, the policy provided that entry must be made by actual force and violence of which there shall be visible marks made by tools. There was no provision in the policy that entry should be made exclusively by force and violence. The Court there held that if force and violence had been used and there were visible marks to show such violence, the policy would apply even if the safe had been opened by manipulation of the combination, because the force and violence was a contributing cause to the opening of the safe.

In *Ganahl Lumber Co. v. Travelers Indemnity Co.,* (Missouri, 1939), 133 S. W. 2d 1050, the policy provided that entry must be made by actual force and violence of which there shall be visible marks made by tools upon the exterior door or wall of the vault. There were marks on the exterior of the door close to the combination, scratches and a chipped place. The enamel was chipped off and the chipped place was just over the combination. The next day the safe could be opened by use of the combination. There was testimony that safes such as the one in question could be opened by parties not knowing the combination by striking it with a hammer and jarring it and listening to the tumblers fall as the combination was manipulated. By this method safes could be opened by use of the combination by force. Testimony was offered by the defendant that safes could not be opened in such a manner. The Court found in that case that the jury should have been instructed that the plaintiff could recover if the combination was manipulated through the use of force and violence of which there were visible marks made by tools.

In *Commercial Casualty Insurance Co. v. Lloyd,* 243 Ala. 416, 10 So. 2d 292, the policy provided that entry of the safe must be made by actual force and violence of

which there must be visible marks made by tools. When discovered the outer door was open with marks upon it which "looked like wrench marks." The handle was bent although it was locked by the combination. The inner door was also open and the locking mechanism of that door was on the floor in front of the safe. Photographs of the safe showed some indentations. The loss was discovered by an employee on a Monday morning. There was no indication of forcible entry into the building or office. The combination and lock on the outer door of the safe were not materially damaged. The combination locked and the bolts moved after the alleged burglary and had been in constant use since that time. The outer door appeared not to have been "tampered with." The chief of police testified that the combination of the outer door was in order and without any marks of violence. An expert witness testified that entry could be effected into the safe only by unlocking the combination on the outer door or breaking the lock. The proof was that the lock was not broken nor was the combination to the safe damaged. The Court there held that the proof was sufficient for the jury to consider as to whether or not the alleged loss came within the coverage of the policy.

In *Maryland Casualty Co. v. Bank of Murdock*, 76 Neb. 314, 107 N. W. 562, the question was whether or not the burglars resorted to the use of tools applied directly upon the safe. The Court said that there was some evidence indicating that it was possible to open the safe in controversy by striking the same with a heavy hammer or other instrument after changing it to a certain position, and this evidence was sufficient, in its opinion, to submit to the jury, and for this reason the court did not err in refusing to instruct the jury to return a verdict for the defendant.

The policy here does not stipulate that entry to the safe must be "solely" and "exclusively" by actual force and violence of which there shall be visible marks made by tools on the outer door, as in some burglary insurance policies. It is admitted that the inner door of the safe

was forced open. There were chisel marks on the outer door where someone "had tried to bust it." The knob was pulled. The dial on the combination appeared to have been hit by a ball-peen hammer and there were marks of this hammer all around the dial. Mr. Moller, the proprietor and owner of a safe company, called as a witness by the defendant, appellant, admitted that as an expert he would use a hammer in opening a safe if the lock was not in good working order. Therefore, hammering could have some effect on the lock. As proprietor and owner of a safe and lock company he could not say it was a burglar proof safe. Mr. Kabernagle, who should know more about this safe than anyone else, said it was guaranteed to withstand *certain attempts at burglary*.

The jury, looking at the evidence in a light most favorable to the plaintiffs, appellees, could have found the matters set forth in this paragraph. This tavern was broken into and the cash register tampered with. The safe had been locked by Joseph Moskios. There were sufficient marks on the inside door of the safe to prove that it had been sprung by force and violence. No one knew the combination except the appellees. There were chisel marks on the outer door where someone had tried to open it. The knob had been pulled and wrenched with a Stillson wrench. The dial on the combination had been struck several times with a hammer. Hammering has some effect on a safe lock. The safe was made only to withstand certain attempts at burglary. The marks being made by a chisel, a Stillson wrench, and a ball-peen hammer, this chiseling, wrenching, and hammering, aided the unlawful expert manipulation of the combination of the safe and were the means by which it was opened as in some of the cases quoted herein. Therefore, the plaintiffs, appellees, should recover under the policy.

The appellant relies strongly on the testimony of Lieutenant Walker Smith, called by the appellees, who stated on cross-examination that the police had no reason to

believe that the force used on the safe opened the door. He did not testify as an expert. This was a jury question. He did not attempt to say that the force and violence which he knew was applied to the outer door of the safe did not substantially aid in the manipulation by an unlawful expert. His testimony corroborated that of the plaintiffs, appellees, as to the wrench marks and hammer marks on the dial of the combination on the outer door immediately after the alleged burglary. We are, therefore, of opinion that the demurrer prayer of the defendant, appellant, was properly refused and that the trial judge was correct in submitting the case to the jury.

The appellant also objects to the following part of the charge given by the trial judge to the jury: "* * * You must be realistic about the matter and recognize the fact that persons who crack safes must be expert in that field, and if you find that this safe was burglarized, that it was broken into, you will realize that the person or persons who did it must have known ways and means of getting into the safe. * * * But, if a person went there and by force and violence, like beating on the combination with a hammer or applying a wrench to the combination knob, or in some other fashion caused the combination to be actuated and worked so that he could throw the bolts that unlock the door, then that would constitute breaking into the safe by force and violence. And, if you find that in doing that the burglar left marks on the door, then the plaintiffs here would be entitled to recover." In other parts of the charge he instructed the jury that, in order to find a verdict for the plaintiffs, it was necessary to find that someone broke into the safe by force and violence and that such breaking was done "not by knowing the combination and turning the combination as the owner would turn the combination, but that they did it by using force and violence." He further instructed them that, if a person knew the combination and simply turned the combination and opened the door and then with a chisel broke into the inner door, for which he per-

haps had no key, it would not entitle the plaintiffs to recover.

As above stated the policy here did not stipulate that entry to the safe must be effected "solely" or "exclusively" by actual force and violence of which there were visible marks made by tools. We, therefore, see no error in this charge. The judgment will be affirmed.

*Judgment affirmed, with costs.*

HAMMOND, J., filed the following dissenting opinion:

One usually gets in this life only what he pays for. Insurance coverage is no exception. The decision in this case, it seems to me, gives the policyholder-appellees extended coverage at no extra premium.

At the threshold we meet the anomaly that the plaintiffs below, the appellees here, were permitted to go to the jury although they produced witnesses who testified that their theory of the case was wrong. The police officer, called by them, said flatly the safe had not been opened by force and violence and that the superficial marks on it did not permit the inference that it had been. Lieutenant Smith, in charge of the investigation, testified that the official police report was accurate in stating that the safe showed "no signs of forced entry on the outside door". He continued: "If any of the marks I have testified to, if they have proved, upon checking the door, that the safe was not intact, the safe was broken, that would lead to my belief that those marks did open the safe. But, according to our investigation, the same was still intact properly so. We did not say that the door was actually opened by those marks in the criminal investigation."

The function of a jury is to determine the facts from conflicting evidence, but a plaintiff does not meet his burden of proof and may not prevail, as a matter of law, if he offers the jury a choice of two versions of the case, one of which makes the defendant liable and the other of which exonerates him.

The opinion of the majority says there was evidence, or permissible inferences from evidence, from which an "ordinary intelligent mind" could conclude that force or violence effected the entry into the safe. It finds this from one or two answers of witnesses, isolated from context and changed in meaning. The opinion summarizes the evidence it feels was sufficient to go to the jury as follows: "The knob had been pulled and wrenched by a Stillson wrench. The dial on the combination had been struck several times with a hammer. Hammering has some effect on a safe lock. The safe was made only to withstand certain attempts at burglary." It concludes that the jury could find that "The marks made by a chisel, a Stillson wrench and a ball-peen hammer aided the unlawful expert manipulation of the combination of the safe and were the means by which it was opened * * *."

Actually, there is not one word of testimony in the record that a wrench, Stillson or otherwise, was used on the safe. Lieutenant Smith plainly was merely likening the ridges or indentations on the knob that turns the combination to the gripping surface of a Stillson wrench, and nothing more. All he did was to compare the appearance of several of the ridges to the worn inner surface of a used Stillson wrench, never suggesting that such a wrench or any other wrench had been used. The argument that hammering must have had some effect on the lock is derived from one answer, on cross-examination, of Moller, the expert on safes, who testified for the defendants. He said he would only use a hammer if he were repairing a defective combination. If a case is to go to the jury on inference from testimony of a defense witness, the fair import of all his immediate testimony on the point must be considered. The transcript shows that this was the immediate and pertinent colloquy between Moller and counsel for appellees: "Q. As an expert of forty years standing, if a safe is locked and if a man were expert in opening a safe, wouldn't he use a hammer or wrench to open the doors? A. No. Q. What would he use a hammer for? A. The only way he would

use a hammer if the lock wasn't in good working order." Not only did this expert say positively, without challenge, that a hammer would not open or help to open the safe in the case at bar, but another witness, Kabernagle, manager of the Mosler Safe Company who manufactured and sold the safe, testified without contradiction that there were no marks of any kind on the outside door indicating entrance had been made with force or violence, and that the safe could withstand attack by ordinary tools for twenty minutes before it could be totally damaged so that it could be entered, and that the only way it could be entered would be by completely knocking off the combination in the front and bending the back of the safe through to entirely release the locking bolts from the safe.

The jury was entirely free to disbelieve both Mr. Moller and Mr. Kabernagle if there were affirmative testimony to the contrary permitting them to form an opinion that rose above speculation. The cases referred to in the majority opinion, in which recovery has been permitted, contain either expert opinion evidence that the safe in question could have been opened by a combination of force and manipulation or evidence that the combination or the locking bolts, or both, showed physical evidence of the application of force sufficient to open the safe. Generally, the locking mechanism of the safe, after the incident that gave rise to the litigation, either did not work at all or very faultily or the safe could be opened in a way it formerly could not have been. In the case before us, the safe worked just as well after the robbery as before. There was no physical change in the bolts or the combination.

If we assume for the argument, that under the language of the policy force and violence need be only a contributing means in the opening of the safe—this interpretation could go as far as to include a tap of the combination dial as part of manipulation—the one answer of Moller that he would use a hammer only when a lock was broken, cannot be tortured on the rack to stretch into evidence that a hammer played any part in the opening

of the safe in this case. Moller's statement, in context, clearly meant that he would use the hammer to break the lock or to repair it after the safe was open. The statement in the opinion that "hammering has some effect on a safe lock" is deduced from the same one sentence of Moller. As a generalization, the quoted statement cannot be challenged. Hammering has some effect on almost anything hammered but nowhere in this case is there any evidence that hammering had any effect in opening the safe, either alone or as part of expert manipulation. Indeed, there was no evidence that there had been manipulation. The jury was permitted to speculate as to how the safe had been opened.

If we were permitted to speculate as the jury was, several theories come to mind as to how the safe was opened. It may not have been locked the night before even though it was thought to have been by one of the appellees. Some safes can be seemingly locked with a small turn of the combination dial and released by turning it back the same distance. While the combination dial is so turned, the handle, if pulled, gives the impression of complete locking. The robbers may have discovered that the safe was unlocked after superficial and futile efforts to open it by force and violence. It is said that Houdini, the escape artist, took far longer to escape from a cell that had been deliberately left unlocked to fool him, than he ever did from a locked cell. The safe may have been opened by the combination, although the appellees say that no one knew it but themselves. It is possible that the combination may have been learned in some manner by an employee or someone else. The safe may have been opened by manipulation alone. If done that way or by use of the known combination, whomsoever did it may have wished to cover up the tracks and make it look like a crime of violence so as to throw the police off the trail. As a basis of decision all such speculations are denied us, just as they should have been denied the jury. I think the record clearly requires the judgment to be reversed.

Chief Judge Brune has authorized me to say that he concurs in the views herein expressed.